120

[No. 81328-1.   En Banc.]
Argued February 12, 2009.      Decided May 7, 2009.

*In the Matter of the Estate of* PAMELA L. KISSINGER.

LEONARD HOSS, *as Personal Representative, Respondent,* v. JOSHUA HOGE, *Petitioner.*

122

*Jean A. O'Laughlin*, for petitioner.

*Mark Leemon* (of *Leemon & Royer, PLLC*), for respondent.

¶1 CHAMBERS, J. — On January 13, 2000, Joshua Hoge was found not guilty by reason of insanity for the murder of his mother, Pamela Kissinger, and stepbrother, James Zachary Kissinger. After obtaining a settlement in a wrongful death action, the personal representative for Pamela's estate brought a motion for a determination of statutory beneficiaries in King County Superior Court, arguing that Hoge was a "slayer" as defined by chapter 11.84 RCW (slayer statute) and that he was therefore barred from receiving any portion of the settlement. Washington's slayer statute prohibits individuals who have participated in the "wilful and unlawful" killing of another person from receiving any benefit as a result of their acts. Ch. 11.84 RCW. We are asked to decide if a finding of "not guilty by reason of insanity" is a complete defense to the slayer statute. We conclude that it is not. An action under the slayer statute is civil, and the determination of whether a slaying was willful and unlawful must be made in civil court notwithstanding the result of any criminal case. A finding of not guilty by reason of insanity does not make an otherwise unlawful act lawful. We agree with the Court of Appeals that willful under the slayer statute means intentionally and designedly. However, we also conclude that

even under this definition, the trial court's findings of fact clearly establish that Hoge acted willfully when he killed his mother and stepbrother. Hoge is barred from recovery under the slayer statute. We affirm the Court of Appeals but find that remand is unnecessary.

## FACTS AND PROCEDURAL HISTORY

¶2 Hoge has a long history of mental illness.[1] He has been diagnosed with schizophrenia (paranoid type), Capgras syndrome,[2] and has heard voices since around the age of nine. The schizophrenia, accompanying delusions, and auditory hallucinations often led Hoge to act out inappropriately during his adolescence, sometimes leading to criminal charges. On some of these occasions, Hoge had threatened to kill his mother. These incidents resulted in Hoge's spending considerable time in various psychiatric hospitals and being treated with antipsychotic and mood-stabilizing medications. The Capgras syndrome likely resulted in Hoge's long-standing delusion that his mother and stepbrother had been replaced by imposters. Hoge had also created a fictional daughter, believed he could enlarge toys by magic and through the use of lenses, and believed he could travel through time.

¶3 On June 23, 1999, Hoge entered his mother's house and stabbed her and his stepbrother to death. Hoge also attempted to kill his mother's boyfriend, Walter Williams, with an ax. At the time, Hoge was not taking his antipsychotic medication. When apprehended by police, Hoge was delusional, claiming he had to kill Pamela and James because they had killed his child. He also claimed that Williams must be magic because he had been stabbed through the head and did not die. Hoge was taken to Valley Medical Center for treatment and then booked into jail.

---

[1] Most of the facts regarding Hoge's mental history come from the forensic mental health report completed by Dr. Gregory Leong, staff psychiatrist at Western State Hospital.

[2] Capgras is a psychiatric condition that causes the affected person to believe that people close to him or her have been replaced by imposters.

¶4 Hoge was charged with two counts of aggravated murder in the first degree and one count of attempted murder in the first degree. He pleaded not guilty by reason of insanity. After receiving mental health evaluations, the court concluded that Hoge was indeed legally insane at the time of the killings. As part of the plea agreement, Hoge stipulated that he had committed the acts charged. On January 13, 2000, Hoge was acquitted by reason of insanity and the court entered an order committing him to treatment at a state mental hospital.

¶5 Pamela's estate filed a wrongful death lawsuit against the state mental health agency, claiming it was liable for Kissinger's death for not timely providing the medications necessary to control Hoge's mental illness.[3] The lawsuit was settled, and the proceeds were entered into an interest bearing account. The personal representative of the estate then filed a petition, arguing that Hoge was prohibited from sharing in the proceeds of the settlement under the slayer statute. Hoge argued that because he was found "not guilty" by reason of insanity, he was absolved of any wrongdoing. The trial court disagreed and found that Hoge "willfully and unlawfully killed Pamela Kissinger . . . and is a slayer within the meaning of RCW 11.84.010(1)." Clerk's Papers (CP) at 147. The court specifically found that "[n]otwithstanding his mental illness, Hoge subjectively knew he was killing a human being when he stabbed Pamela Kissinger, and did so with premeditated intent." CP at 146.

¶6 Hoge appealed, arguing that he could not have acted unlawfully or willfully because he had been found not guilty. The Court of Appeals held that despite the acquittal, Hoge acted unlawfully when he killed Pamela and James. However, the court also found that the trial court applied the wrong definition of willful. Relying on this court's

---

[3] According to the petition for review, the estate alleged that Hoge attempted to obtain his antipsychotic medications from the mental health agency just before the killings took place and was told he could not get them for a week. The State does not dispute that this was the allegation.

analysis in *New York Life Insurance Co. v. Jones*, 86 Wn.2d 44, 47, 541 P.2d 989 (1975), the Court of Appeals held that an act is willful for purposes of the slayer statute only if it is done "intentionally and designedly." *In re Estate of Kissinger*, 142 Wn. App. 76, 80-81, 173 P.3d 956 (2007). The case was remanded to the trial court for a determination of Hoge's willfulness under the "intentionally and designedly" standard. Hoge petitioned this court for discretionary review of the Court of Appeals decision regarding the unlawfulness of his act. The estate cross petitioned on the issue of the definition of willfulness under the slayer statute. We granted review on both issues.[4] *In re Estate of Kissinger*, 164 Wn.2d 1013, 195 P.3d 88 (2008).

ANALYSIS

¶7 We are asked to interpret RCW 11.84.010. We interpret statutes de novo. *Morgan v. Johnson*, 137 Wn.2d 887, 891, 976 P.2d 619 (1999). We also interpret questions of law de novo. *State v. Linton*, 156 Wn.2d 777, 783, 132 P.3d 127 (2006).

A. Background

¶8 The common law has long adhered to the maxim, *nullus commodum capere potest de injuria sua propria*, or, no one should be allowed to profit from his own wrong. John W. Wade, *Acquisition of Property by Willfully Killing Another – A Statutory Solution*, 49 HARV. L. REV. 715, 715 (1936). With this principle in mind, New York became the first state to adopt the slayer rule in the late 19th century. *Riggs v. Palmer*, 115 N.Y. 506, 22 N.E. 188 (1889); Mary Louise Fellows, *The Slayer Rule: Not Solely a Matter of Equity*, 71 IOWA L. REV. 489, 491 (1986). The rule was initially applied to circumstances where the slayer killed

---

[4] Hoge challenged the Court of Appeals decision on equal protection grounds for the first time in his petition for review. He appears to have abandoned this issue in his supplemental briefing. In any event, we believe there is no merit to this argument.

specifically to inherit from his victim on the theory that killing for greed should not be rewarded. Fellows, *supra*, at 491. As the rule has developed, it has been expanded to preclude slayers from benefiting from their acts regardless of whether they were economically motivated. *Id*.

¶9 The rule adopted in *Riggs* was followed by other courts and eventually codified in most states. Kent S. Berk, Comment, *Mercy Killing and the Slayer Rule: Should the Legislatures Change Something?*, 67 TUL. L. REV. 485, 492 (1992). However, while the underlying rationale for the rule has remained intact, the exact contours of the various slayer statutes differ from state to state. For example, while most states have adopted the "felonious and intentional killing" standard in defining who is considered a slayer, others have adopted different definitions. Fellows, *supra*, at 498-99. Some do not apply the slayer rule if the slayer immediately commits suicide following the killing. *See, e.g.*, *Smith v. Greenburg*, 121 Colo. 417, 422-23, 218 P.2d 514 (1950). Most states have been reluctant to extend the rule beyond the slayer and deny the slayer's heirs from taking directly from the victim's estate. Fellows, *supra*, at 495. Courts have recognized that an overly formulistic application of the rule can have unfortunate consequences for those already victimized by the slayer's conduct. Court's have been reluctant to apply the rule too narrowly when it could harm the victim's spouse, children, or dependents as recoveries by the slayer are often the only source of funds available to the surviving victims.[5] Thus, application of the slayer rule varies among the states and the interpretation is often policy driven.

¶10 Washington first applied the slayer rule in 1926 in *In re Estate of Tyler*, 140 Wash. 679, 250 P. 456 (1926). J. Gordon Gose & Joseph W. Hawley, *Probate Legislation*

---

[5] Some states allow title to pass to the slayer but require it to be held in constructive trust for the heirs or next of kin of the decedent. *See, e.g.*, *Kelley v. State*, 105 N.H. 240, 242, 196 A.2d 68 (1963); *Hargrove v. Taylor*, 236 Or. 451, 453, 389 P.2d 36 (1964); *see also* IND. CODE § 29-1-2-12.1 (2008). This issue is not before us.

*Enacted by the 1955 Session of the Washington Legislature*, 31 WASH. L. REV. 22, 25 (1956). In that case, this court held that a man who murdered his spouse was not eligible for an award in lieu of homestead from the spouse's property. *In re Estate of Tyler*, 140 Wash. at 691. The legislature codified the court's holding preventing a slayer from obtaining an award in lieu of homestead but did not address a slayer's rights with regard to the statutes of descent and distribution. Gose & Hawley, *supra*, at 25 (citing LAWS OF 1927, ch. 185, § 1, amending REM. COMP. STAT. § 1473). When the slayer issue next arose in *In re Estates of Duncan*, 40 Wn.2d 850, 246 P.2d 445 (1952), the court was confronted with the claim of a son who murdered his father and then sought to inherit from his father's estate. Given that the legislature, in codifying the slayer rule, had limited it to awards in lieu of homestead, this court refused to extend it to the statutes of descent and distribution but said:

> Although the result shocks our conscience (and well it should), we believe that the existing applicable statutes can only be construed to permit appellant to inherit his father's estate . . . . We have no doubt the legislature will take prompt action so the result we are forced to reach in the instant case may be avoided in the future.

*Id.* at 854.

¶11 The legislature responded to our appeal in 1955 and adopted our current slayer statute. LAWS OF 1955, ch. 141, *codified as* ch. 11.84 RCW. RCW 11.84.020 states that "[n]o slayer shall in any way acquire any property or receive any benefit as the result of the death of the decedent." For purposes of the distribution of the estate, a person determined to be a slayer is deemed to have predeceased the decedent. RCW 11.84.030. A slayer is defined as "any person who participates, either as a principal or an accessory before the fact, in the *wilful and unlawful* killing of any other person." RCW 11.84.010(1) (emphasis added).

¶12 Washington is not among the minority of states that require a conviction of intentional homicide to fall

under the slayer statute. Most jurisdictions now agree that the better rule is to allow the civil courts to litigate the issue of culpability. Fellows, *supra*, at 501. "No jurisdiction treats an acquittal as conclusive evidence of the lawfulness of the killing." *Id.* at 504. A party seeking to bar another from benefiting under the slayer statute must demonstrate by a preponderance of the evidence that the opposing party committed a willful and unlawful homicide regardless of the outcome of any criminal proceeding. *Leavy, Taber, Schultz & Bergdahl v. Metro. Life Ins. Co.*, 20 Wn. App. 503, 507, 581 P.2d 167 (1978).

## B. Unlawful

■ ¶13 This court has not previously determined the meaning of "unlawful" as it is used in the slayer statute. Hoge stipulated to the fact that he met the requirements for first degree murder when he killed Pamela and James.[6] However, Hoge argues that a person found not guilty by reason of insanity cannot have acted unlawfully because insanity is a complete defense that absolves a defendant of all criminal responsibility. *See State v. Crenshaw*, 98 Wn.2d 789, 793, 659 P.2d 488 (1983). Because the legislature used the phrase "not guilty by reason of insanity" rather than "guilty but insane," Hoge argues his analysis follows legislative intent. But, a criminal conviction is not an indispensable requisite for determining that a person is a slayer under the statute. *Leavy*, 20 Wn. App. at 507. One can be determined to be a slayer without going through any criminal proceeding whatsoever. While a criminal conviction may be offered as evidence to establish that an individual is a slayer in a civil action, it does not follow that the lack of a criminal conviction forecloses the possibility that one acted unlawfully.

■ ■ ¶14 *Black's Law Dictionary* defines "unlawful" as "[n]ot authorized by law." BLACK'S LAW DICTIONARY 1574 (8th

---

[6] Hoge stipulated that he, "with premeditated intent to cause the death of another person did cause the death of Pamela Kissinger." CP at 16. Hoge entered the same stipulation with regard to the killing of James Zachary Kissinger.

ed. 2004). In order to establish an insanity defense, the defendant must show that, as a result of a mental disease or defect, he was "unable to perceive the nature and quality of the act" or that he was "unable to tell right from wrong with reference to the particular act charged." RCW 9A.12-.010(1)(a), (b). Importantly, the defendant does not argue that the unlawful act did not occur. The insanity statute does not make homicide lawful; it simply declines to punish a defendant who has committed an unlawful act but is found legally insane.

¶15 To better understand this issue, it is helpful to highlight the differences between an insanity defense and the defense of diminished capacity. When a defendant claims diminished capacity, the State has the burden of proving that the defendant had the required mental state when he committed the alleged acts. Brett C. Trowbridge, *The New Diminished Capacity Defense in Washington: A Report from the Trowbridge Foundation*, 36 GONZ. L. REV. 497, 497 (2001). A defendant defending on the basis of diminished capacity claims he did not intend the act. *Id.* at 499. If the State fails to meet its burden, the defendant will either be acquitted or convicted of a lesser offense. *Id.* at 498. In contrast, insanity is an affirmative defense, which the defendant must prove by a preponderance of the evidence. *Id.* The defendant argues that he did intend his actions but was under the mistaken belief he was justified because of a delusion or inability to distinguish right from wrong.[7] *Id.* at 499. In an insanity defense, the defendant admits that he has committed an act the legislature has deemed unlawful but argues that he should not be criminally punished.

¶16 We have also contrasted the insanity defense with that of self-defense, and the comparison illuminates the distinction between a homicide authorized by law (lawful)

---

[7] In Hoge's criminal case, the trial court's findings of fact stated that due to the "proportion and magnitude of his mental disease or defect, the defendant's mind was affected to such an extent that he was unable to appreciate the nature and quality of his acts" and "he was unable to know right from wrong." CP at 21.

and an act that we simply decline to criminally punish. *State v. Box*, 109 Wn.2d 320, 745 P.2d 23 (1987). In analyzing which party has the burden of proof when the defendant raises an insanity defense, we held that insanity is an affirmative defense that must be raised by the defendant and proved by the defendant by a preponderance of the evidence. *Id.* at 322. Unlike self-defense, which is a lawful act despite the fact it may have lethal consequences, "committing an act under an insane impulse does not make that act lawful." *Id.* at 329. We continued:

> "[I]nsanity entitles a defendant to an acquittal not because it establishes innocence (*i.e.*, state has failed to prove element of criminal intent) but because the state declines to convict or punish one shown to have committed the crime while mentally impaired. . . . In other words, the mental state of 'insanity' does not go to the elements of the crime but merely the ultimate culpability of the accused."

*Id.* (alterations in original) (quoting *Gilcrist v. Kincheloe*, 589 F. Supp. 291, 294 (E.D. Wash. 1984), *aff'd*, 774 F.2d 1173 (9th Cir. 1985)). We find the reasoning of the *Box* court applies to the slayer statute. The affirmative defense of insanity precludes criminal punishment, but it does not legally authorize a person to kill another human being. Nor does it negate a necessary element of the crime. We hold that a finding of not guilty by reason of insanity does not make an otherwise unlawful act lawful for application of the slayer statute. Hoge admitted that he killed his mother and stepbrother, and we affirm the trial court[8] and Court of Appeals holding that the act was unlawful.

## C. Willful

¶17 The estate claims that the Court of Appeals erred by holding "intentionally and designedly" was the

---

[8] In its conclusions of law, the trial court found the "killing of Pamela Kissinger by Hoge, having been committed with premeditated intent, was neither justifiable homicide nor excusable homicide, but constituted aggravated murder in the first degree and was unlawful." CP at 146.

proper definition of willful under the slayer statute. Instead, the estate argues that the definition of willful contained in the criminal code encompasses willful as it is used in RCW 11.84.010(1), a civil statute. The criminal code states that a requirement of willfulness is satisfied by acting "knowingly with respect to the material elements of the offense." RCW 9A.08.010(4). A person acts knowingly when:

> (i) he is aware of a fact, facts, or circumstances or result described by a statute defining an offense; or

> (ii) he has information which would lead a reasonable man in the same situation to believe that facts exist which facts are described by a statute defining an offense.

RCW 9A.08.010(1)(b). The estate argues that because Hoge subjectively knew he was killing human beings, he acted willfully as that term is defined in the criminal code. But we are mindful that the slayer statute is not a criminal statute. Its origins are in equity. Equity should not be used to work an injustice, either by allowing a person to benefit from an unlawful act or by depriving an innocent (such as a subsequent heir or a victim) of a source of recovery.

¶18 We previously interpreted the meaning of willful in the context of the slayer statute in *Jones*. Donna Jones killed her husband but pleaded guilty to a charge of felony murder based on the predicate crime of assault in the second degree. *Jones*, 86 Wn.2d at 45. New York Life Insurance Company had issued a policy on the life of the decedent. *Id*. The question in *Jones* was whether a defendant convicted of second degree felony murder could be considered, as a matter of law, a slayer under RCW 11.84.010. *Jones*, 86 Wn.2d at 46. We held that "willful" under the slayer statute was to be given its ordinary, everyday meaning and what it was understood to have meant at common law. *Id*. at 47. We therefore concluded that "willful" meant "intentionally and designedly." *Id*. Jones' plea to second degree murder neither established the requisite intent nor prevented that intent from being established in a civil trial.

¶19 The estate argues that the criminal code definition of willful was adopted after our decision in *Jones* and that the definition codified by the legislature must apply. We disagree. While the legislature has defined willful, it has done so only in the criminal context. RCW 11.84.010, as noted above, is a civil statute subject to its own standards and burdens of proof. The Court of Appeals was correct in holding that the trial court should have applied the definition we established in *Jones*.

¶20 The estate argues that Hoge still had the requisite level of willfulness regardless of which definition we apply. We agree. Certainly, Hoge could have been so delusional that he did not intend or even know that he was killing a human being. Not every homicide committed by the criminally insane is willful and deliberate. But the trial court made very specific findings of fact and conclusions of law and determined that Hoge acted with premeditated intent when he killed his mother. CP at 146. And Hoge himself stipulated in the criminal proceeding that his actions were intentional and premeditated. CP at 16. The evidence clearly shows that Hoge acted intentionally and designedly and therefore willfully when he killed his mother and stepbrother. We hold that on the record before us, the estate has established the requisite state of mind to invoke the slayer statute.

CONCLUSION

¶21 Chapter 11.84 RCW is a civil statute and a determination of whether a person is a slayer as defined by the act must be made independently of any criminal proceeding. A finding of not guilty by reason of insanity does not make an otherwise unlawful homicide lawful. Willful under the slayer statute means intentionally and designedly. Upon the record before us, Hoge's actions were willful and unlawful when he killed his mother and he is barred from recovery under chapter 11.84 RCW. We affirm.

ALEXANDER, C.J., and C. JOHNSON, MADSEN, SANDERS, OWENS, FAIRHURST, J.M. JOHNSON, and STEPHENS, JJ., concur.